ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-5339**

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CAMPAIGN LEGAL CENTER,

*Plaintiff-Appellant*,

*v.*

FEDERAL ELECTION COMMISSION,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Columbia, No. 1:22-cv-01976-JEB
Before the Honorable James E. Boasberg

---

## APPELLANT'S OPENING BRIEF

---

Megan P. McAllen (DC Bar No. 1020509)
Erin Chlopak (DC Bar No. 496370)
Allison Walter (DC Bar No. 90008637)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
Email: mmcallen@campaignlegalcenter.org
Email: echlopak@campaignlegalcenter.org
Email: awalter@campaignlegalcenter.org

*Counsel for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellant Campaign Legal Center hereby certifies as follows:

**(A) Parties and Amici.** Campaign Legal Center is the plaintiff in the district court and appellant in this Court. Campaign Legal Center is a nonpartisan, nonprofit corporation that has no parent companies, does not issue stock, and in which no publicly held corporation has any form of ownership interest. Campaign Legal Center works to protect and strengthen the U.S. democratic process across all levels of government, including by supporting campaign finance reform through litigation, policy analysis, and public education.

The Federal Election Commission ("FEC") is the defendant in the district court and appellee in this Court.

**(B) Rulings Under Review.** Plaintiff-appellant Campaign Legal Center appeals the December 8, 2022 memorandum opinion (ECF No. 18) and order (ECF No. 17) of the United States District Court for the District of Columbia (Boasberg, J.) granting Defendant Federal Election Commission's Motion to Dismiss. The December 8, 2022 opinion is not published in the federal reporter but is available at 2022 WL 17496211 and reproduced in the Joint Appendix at JA 32-49.

**(C) Related Cases.** The appealed ruling has not previously been before this Court or any other court. There are no related cases pending in this Court or any other court of which counsel are aware.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

TABLE OF CONTENTS...................................................................................iv

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY OF ABBREVIATIONS ...............................................................ix

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................5

ISSUES PRESENTED......................................................................................5

STATUTES AND REGULATIONS..................................................................6

STATEMENT OF THE CASE..........................................................................6

I.   Statutory and Regulatory Framework....................................................6

    A. FECA disclosure provisions ..........................................................6

    B. FEC administrative complaint and enforcement process ..............8

II.  Factual Background ..............................................................................10

    A. Plaintiff files an administrative complaint and supplement alleging
       violations of the Act...................................................................10

    B. The FEC's Office of General Counsel recommends finding reason to
       believe and opening an investigation .........................................12

    C. The Commissioners reject the General Counsel's reason-to-believe
       recommendation, decline to dismiss as a matter of prosecutorial
       discretion, dismiss the complaint, and issue Statements of Reasons ...........14

III. Proceedings Below ..............................................................................17

SUMMARY OF ARGUMENT ......................................................................19

STANDING ...................................................................................................23

STANDARD OF REVIEW ...........................................................................24

ARGUMENT ................................................................................................25

I.   The district court erred in holding the dismissal of plaintiff's administrative
    complaint unreviewable. ......................................................................25

    A. Neither *Commission on Hope* nor *New Models* bars review of FEC
       dismissals premised on legal interpretation...............................26

B. The dismissal here is reviewable because the Commissioners' purported exercise of prosecutorial discretion cannot be disentangled from their legal conclusions on the merits ..................................................29

    1. The dismissal rested on substantive legal and factual analysis ............30

    2. The district court erred in presuming that the Commissioners' invocation of prosecutorial discretion would stand independently of their merits judgments ....................................................33

II. The district court relied on rulings that are contrary to fixed law and should not be followed ..................................................................36

CONCLUSION ........................................................................42

CERTIFICATE OF COMPLIANCE ......................................43

CERTIFICATE OF SERVICE .............................................44

ADDENDUM ..........................................................................45

# TABLE OF AUTHORITIES

*Authorities upon which appellants principally rely are marked with an asterisk*

**Cases:**                                                                                                          Page

*Akins v. FEC*,
  101 F.3d 731 (D.C. Cir. 1996) (en banc)................................................21, 22, 39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................24

*Buckley v. Valeo*,
  424 U.S. 1 (1976)............................................................................................6

*Campaign Legal Center v. FEC*,
  31 F.4th 781 (D.C. Cir. 2022)....................................................................23, 24

*Campaign Legal Center & Democracy 21 v. FEC*,
  952 F.3d 352 (D.C. Cir. 2020)...............................................22, 23, 39, 40, 41

*Chamber of Commerce v. FEC*,
  69 F.3d 600 (D.C. Cir. 1995)......................................................................22, 38

*Citizens United v. FEC*,
  558 U.S. 310 (2010)........................................................................................6

*Common Cause v. FEC*,
  842 F.2d 436 (D.C. Cir. 1988).........................................................................9

*CREW v. American Action Network*,
  590 F. Supp. 3d 164 (D.D.C. 2022)................................................................39

*CREW v. FEC*,
  316 F. Supp. 3d 349 (D.D.C. 2018)................................................................39

*\*CREW v. FEC*, 993 F.3d 880
  (D.C. Cir. 2021) ("*New Models*")...........................2-5, 20-22, 25, 27, 30, 37, 40

*CREW v. FEC*, 55 F.4th 918
  (D.C. Cir. 2022) ("*New Models II*") .............................. 20, 21, 28, 29, 33, 36, 40

*\*CREW v. FEC*, 892 F.3d 434
  (D.C. Cir. 2018) ("*Commission on Hope*") .................. 2, 3, 5, 25, 27, 29, 37, 41

*CREW v. FEC*, 923 F.3d 1141
  (D.C. Cir. 2019) ("*Commission on Hope II*")...........................22, 25, 38, 40, 41

*Democratic Congressional Campaign Committee v. FEC*,
  831 F.2d 1131 (D.C. Cir. 1987) ("*DCCC*")................................................22, 38

*FEC v. Democratic Senatorial Campaign Committee*,
454 U.S. 27 (1981)..................................................................................27

*\*FEC v. Akins*,
524 U.S. 11 (1998)........................................ 3, 21, 22, 24, 27, 33, 37

*Heckler v. Chaney*,
470 U.S. 821 (1985)................................... 2, 3, 14, 22, 27, 36-40

*International Union, United Mine Workers v. Dep't of Labor*,
358 F.3d 40 (D.C. Cir. 2004)............................................................35

*Lieu v. FEC*,
370 F. Supp. 3d 175 (D.D.C. 2019).................................................39

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015)..........................................................................25

*Orloski v. FEC*,
795 F.2d 156 (D.C. Cir. 1986)...............................................9, 22, 38

*Public Citizen v. FEC*,
547 F. Supp. 3d 51 (D.D.C. 2021)...................................................40

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011)............................4, 23, 24, 37, 41

*Stop This Insanity Inc. Emp. Leadership Fund v. FEC*,
761 F.3d 10 (D.C. Cir. 2014)...........................................................24

**Statutes:**

28 U.S.C. § 1291 .................................................................................5

28 U.S.C. § 1331 .................................................................................5

52 U.S.C. § 30104(a)(1).......................................................................6

52 U.S.C. § 30104(b) .......................................................................7, 10

52 U.S.C. § 30104(b)(5) .....................................................................6

52 U.S.C. § 30104(b)(5)(A) ...........................................................12, 14

52 U.S.C. § 30104(b)(6) .....................................................................6

52 U.S.C. § 30109(a)(1).......................................................................8

52 U.S.C. § 30109(a)(2).......................................................................8

52 U.S.C. § 30109(a)(3).......................................................................9

52 U.S.C. § 30109(a)(4)(A) ........................................................9

52 U.S.C. § 30109(a)(5) ..............................................................9

52 U.S.C. § 30109(a)(6)(A) ........................................................9

52 U.S.C. § 30109(a)(8)..........................................20, 25, 38, 40

52 U.S.C. § 30109(a)(8)(A) ............................................3, 5, 9, 17

52 U.S.C. § 30109(a)(8)(C) ..............................................9, 10, 38

52 U.S.C. § 30109(a)(9)..............................................................5

**Regulations and Rulemaking Documents:**

11 C.F.R. § 104.3(b) ............................................................12, 14

11 C.F.R. § 104.3(b)(3)(i) ..........................................................7

11 C.F.R. § 104.3(b)(3)(i)(A) ....................................................7

11 C.F.R. § 104.3(b)(4)(i) ..........................................................7

11 C.F.R. § 104.3(b)(4)(i)(A) ....................................................7

11 C.F.R. § 111.4(b) ..................................................................8

11 C.F.R. § 111.4(d) ..................................................................8

**Other Materials:**

Conciliation Agreement, MUR 4872 (Jenkins for Senate 1996) (Feb. 15, 2002) .................................................................... 7

Factual and Legal Analysis, MUR 6724 (Bachmann for President) (July 13, 2017) ............................................................. 7, 8

Factual and Legal Analysis, MUR 6818 (Allen Weh for Senate) (June 15, 2017) ................................................................. 8

FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545 (Mar. 16, 2007) ............................................................. 8

FEC, Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887 (Jan. 9, 2007) ...................... 7

General Counsel's Brief, MUR 3847 (Stockman) (Sept. 15, 1997).........................7

Statement of Reasons of Chair Lee Goodman & Comm'rs Caroline C. Hunter & Matthew S. Petersen, MUR 6396 (Crossroads GPS) (Jan. 8, 2014), https://www.fec.gov/files/legal/murs/6396/14044350970.pdf ....................40

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| **CREW** | Citizens for Responsibility and Ethics in Washington |
| **DNC** | Democratic National Committee |
| **FEC** | Federal Election Commission |
| **FECA** | Federal Election Campaign Act |
| **Trump MAGA Committee** | Trump Make America Great Again Committee |
| **MUR** | (FEC) Matter Under Review |

## INTRODUCTION

This case challenges the Federal Election Commission's ("FEC" or "Commission") unlawful dismissal of an administrative complaint filed by plaintiff-appellant Campaign Legal Center against former 2020 presidential candidate Donald J. Trump's authorized campaign committee, Donald J. Trump for President, Inc. ("Campaign"), and one of his authorized joint fundraising committees, Trump Make America Great Again Committee ("Trump MAGA Committee"; collectively, "Committees" or "Trump Committees") for violations of the Federal Election Campaign Act ("FECA" or "Act").[1]

The disclosure violations alleged in the administrative complaint were egregious and clear-cut. The complaint documented, in meticulous detail, how the Trump Committees had unlawfully concealed upwards of three quarters of a *billion* dollars in 2020 campaign spending—amounting to the lion's share of their spending for the entire presidential election cycle—by routing payments to campaign vendors and staff through affiliated firms without reporting their ultimate payees as required by FECA and FEC authorities. All told, the potential amount in violation, $781,584,527, would have been the largest in the Commission's history. *See* JA 243.

---

[1] In February 2021, the Campaign changed its name to Make America Great Again PAC and converted to a multicandidate committee. *See* Joint Appendix ("JA") 224.

Nevertheless, the Commission, contrary to the recommendations of its Office of General Counsel, dismissed the complaint after deadlocking 3-3 on two separate votes: first, on whether to find "reason to believe" FECA had been violated, and second, on whether to exercise the Commission's prosecutorial discretion and dismiss the complaint under *Heckler v. Chaney*, 470 U.S. 821 (1985). *See* JA 221-23.

The three Commissioners who voted against finding reason to believe, and whose rationale is therefore treated as "controlling" for purposes of judicial review, later invoked prosecutorial discretion in a Statement of Reasons justifying their votes. But, as plaintiff explained in opposing the FEC's motion to dismiss below, the Commissioners explicitly rested that supposed exercise of prosecutorial discretion on their legal analysis of the complaint's merits—and an FEC dismissal premised on interpretations of law is not shielded from judicial scrutiny simply because it is accompanied by a contingent invocation of prosecutorial discretion.

The district court incorrectly found otherwise, however, and granted the FEC's motion to dismiss. In so holding, the court relied on *Citizens for Responsibility and Ethics in Washington (CREW) v. FEC*, 993 F.3d 880 (D.C. Cir. 2021) ("*New Models*"), and *CREW v. FEC*, 892 F.3d 434 (D.C. Cir. 2018)

("*Commission on Hope*"),[2] two recent divided panel rulings by this Court holding that certain FEC dismissals premised on prosecutorial discretion are unreviewable. But the lower court's reliance on these decisions, which conflict with controlling Supreme Court and prior Circuit precedent, was in error.

Even under *Commission on Hope* and *New Models*, administrative complaints dismissed on the basis of the Commission's interpretations of law—including where, as here, the Commission invokes prosecutorial discretion based on its substantive legal analysis rather than as a "distinct ground[]" for dismissal, *New Models*, 993 F.3d at 884—remain subject to the judicial review that FECA expressly provides. *See Commission on Hope*, 892 F.3d at 441 n.11 ("The interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion.") (citing *Heckler*, 470 U.S. at 833 n.4; *FEC v. Akins*, 524 U.S. 11, 26 (1998)); 52 U.S.C. § 30109(a)(8).

Here, the linchpin of the controlling Commissioners' decision to dismiss plaintiff's complaint was their determination that there was no "reason to believe" the Trump Committees violated FECA. While the Commissioners characterized their decision—and the FEC has defended it—as an exercise of prosecutorial discretion, their Statement of Reasons belies that assertion. Instead, it makes clear

---

[2] To differentiate between cases brought by CREW, this brief refers to each by the name of the administrative respondent, and to the *Commission on Hope* and *New Models* decisions collectively as the "*CREW*" cases.

that the Commissioners' invocation of prosecutorial discretion was merely an endpoint of their legal reasoning: each "discretionary" justification they put forward was firmly premised on an underlying assessment of the legal merits. Far from suggesting that discretion was an alternative or "distinct" basis for the Commissioners' decision, as in *New Models*, 993 F.3d at 884, their Statement indicates that prosecutorial discretion was simply an expedient framing device in which to package their dispositive assessments of fact and law. The district court thus erred by presuming what path the agency would take on remand in the event the Commissioners' underlying legal errors were corrected or modified through judicial review. And, contrary to the ruling below, the *CREW* decisions do not shield those legal errors from scrutiny.

Nor could they. Even if the holdings in *New Models* and *Commission on Hope* did apply to FEC dismissals like this one, where the agency's claimed discretionary concerns are indistinguishable from its substantive legal judgments, this Court should not follow those decisions because they contradict Supreme Court and prior Circuit precedent that is directly controlling here. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). Either way, the dismissal of plaintiff's administrative complaint remains reviewable under FECA's contrary-to-law standard, and the district court's finding otherwise was in error.

Accordingly, the decision below should be reversed, and the case remanded for consideration of whether the dismissal was contrary to law.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this timely appeal from a final order in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1291 and 52 U.S.C. § 30109(a)(9). The district court had subject-matter jurisdiction over the case under 28 U.S.C. § 1331 and 52 U.S.C. § 30109(a)(8)(A). Appeal was timely taken on December 21, 2022, within sixty days of the district court's memorandum opinion and order, entered December 8, 2022, granting defendant's motion to dismiss and disposing of all claims in this action.

## ISSUES PRESENTED

1.      Whether the district court erred by holding the dismissal of Campaign Legal Center's administrative complaint unreviewable as based on an exercise of prosecutorial discretion, where the Commissioners' purported exercise of prosecutorial discretion was dependent upon erroneous interpretations of law.

2.      Whether the district court erred in finding nonreviewability "foreordained" by the divided panel decisions in *Commission on Hope*, 892 F.3d 434, and *New Models*, 993 F.3d 880, notwithstanding that those decisions contravene Supreme Court and prior D.C. Circuit precedent.

## STATUTES AND REGULATIONS

All applicable statutory and regulatory provisions are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Framework

### A. FECA disclosure provisions

A core purpose of federal campaign finance law is to serve the electorate's interest in knowing "where political campaign money comes from and how it is spent," *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (per curiam) (quoting H.R. Rep. No. 92-564, at 4 (1971)), and thereby "enable[] the electorate to make informed decisions," *Citizens United v. FEC*, 558 U.S. 310, 371 (2010). Toward that end, FECA contains numerous provisions designed to ensure accurate reporting from those who give and spend money to influence elections.

One such provision requires that "[e]ach treasurer of a political committee . . . file reports of receipts and disbursements" with the Commission. 52 U.S.C. § 30104(a)(1). These reports must disclose "the name and address" of each person to whom the committee has made operating expenditures or other disbursements of over $200, "together with the date[s], amount[s], and purpose[s]" of those expenditures or disbursements. *Id.* § 30104(b)(5), (6).

FEC regulations similarly require that political committees disclose the dates, amounts, and purposes of expenditures and disbursements in excess of $200. 11 C.F.R. § 104.3(b)(3)(i), (4)(i). These regulations define "purpose" to mean "a brief statement or description of why the disbursement was made." *Id.* § 104.3(b)(3)(i)(A), (4)(i)(A). A Commission policy statement further provides that the "purpose" description, together with the recipient's name, should enable "a person not associated with the committee [to] easily discern why the disbursement was made." FEC, Statement of Policy: "Purpose of Disbursement" Entries for Filings with the Commission, 72 Fed. Reg. 887, 888 (Jan. 9, 2007).

Commission precedent further makes clear that a federal political committee must itemize payments to a subvendor if (1) the immediate vendor receiving the disbursement does not have an arm's-length relationship with the committee, (2) the payments to the subvendor are unrelated to the services provided pursuant to the immediate vendor's contract with the committee, or (3) the immediate vendor is merely acting as a "conduit" for disbursements to subvendors. *See, e.g.*, General Counsel's Brief 33-37, MUR 3847 (Stockman) (Sept. 15, 1997); Conciliation Agreement at 2-4, MUR 4872 (Jenkins for Senate 1996) (Feb. 15, 2002); Factual and Legal Analysis at 8-10, MUR 6724 (Bachmann for President) (July 13, 2017). Under these circumstances, failing to itemize disbursements to the ultimate payee violates 52 U.S.C. § 30104(b).

In addition, Commission precedent specifically indicates that political committees must itemize and individually report salary payments to committee staffers, even when those staffers are paid through an outside firm. *See* Factual and Legal Analysis at 4-6, MUR 6818 (Allen Weh for Senate) (June 15, 2017); *see also* Factual and Legal Analysis at 8-10, MUR 6724 (Bachmann for President) (July 13, 2017).

### B. FEC administrative complaint and enforcement process

Any person may file a complaint with the FEC alleging a violation of FECA. 52 U.S.C. § 30109(a)(1). Commission regulations specify, in relevant part, that a complaint must identify the complaints and be sworn and signed, and that any allegations in a complaint "not based upon personal knowledge" should identify the source of the information that "gives rise to the complainant's belief in the truth of such." 11 C.F.R. § 111.4(b), (d).

The Commission, after reviewing the complaint, any responses, and the Office of General Counsel's recommendation, then votes on whether there is "reason to believe" a violation has occurred. 52 U.S.C. § 30109(a)(2). The Commission will find "reason to believe" where a complaint "credibly alleges" that a FECA violation "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545, 12545 (Mar. 16, 2007).

After any investigation, if the Commission finds probable cause to believe a FECA violation occurred, 52 U.S.C. § 30109(a)(3), it seeks a conciliation agreement with the respondent, which may include civil penalties, *id.* § 30109(a)(4)(A), (a)(5). If the Commission is unable to correct the violation and enter a conciliation agreement, it may institute a civil enforcement action in federal district court. *Id.* § 30109(a)(6)(A). All of these decisions require four affirmative votes. If, at any of these decision-making junctures, fewer than four Commissioners vote to proceed, the Commission may vote to dismiss the complaint and the controlling group of Commissioners who voted not to proceed must issue a Statement of Reasons to serve as the basis for any judicial review. *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988).

Any "party aggrieved" by the Commission's dismissal or failure to act upon an administrative complaint may seek judicial review in the U.S. District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8)(A). The court "may declare that the dismissal . . . is contrary to law, and may direct the Commission to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C). A dismissal is contrary to law "if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986) (citations omitted).

9

Should the agency fail to comply with an order directing it to conform, "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109(a)(8)(C).

## II. Factual Background

### A. Plaintiff files an FEC administrative complaint and supplement alleging violations of the Act.

On July 24, 2020, Campaign Legal Center and Margaret Christ, an individual, filed an administrative complaint with the FEC alleging that the Trump Committees had violated 52 U.S.C. § 30104(b) by routing payments to vendors and staff through two firms—American Made Media Consultants, LLC ("American Made"), a corporation apparently created and controlled by Campaign officials, and Parscale Strategy, LLC, the consulting firm of former Campaign manager Bradley J. Parscale—without itemizing those disbursements or properly reporting them to the FEC. *See* JA 12; JA 77-90.

In a supplement to the administrative complaint filed on January 28, 2021, complainants detailed how the Committees had continued to route payments through American Made and Parscale Strategy in the six months since the original administrative complaint was filed, and provided further evidence that American Made was an extension of the Trump Campaign used to conceal the Campaign's spending, such as reporting that senior Campaign officials had approved American Made's creation and served on its board. JA 13; JA 121-26.

10

Collectively, the administrative complaint and its supplement—drawing on publicly available information including media reports, public statements by Trump Campaign officials and contractors, FEC disclosure reports, and filings with other state and federal agencies—alleged that the Committees violated FECA by failing to itemize and accurately describe the purposes of payments to subvendors paid through American Made and Parscale Strategy even though (1) neither firm had an arm's-length relationship with the Committees and (2) both firms were used by the Committees as conduits for disbursements to subvendors and staff that were effectively working directly for the Committees. JA 6, 13, 18.

Responses to the administrative complaint filed by American Made, its parent corporation, and the Committees did not dispute any of complainants' factual assertions; for example, respondents "acknowledged that [American Made] has been run by individuals known and trusted by the Campaign," JA 20-21, JA 169, and did not deny that the Trump Campaign's disbursements to Parscale Strategies included undisclosed salary payments for individuals who were in fact working for the Campaign directly, JA 191. *See also* JA 133-35; JA 146-51. Instead, the respondents generally asserted that the complaint failed to state a violation of FECA, arguing, *inter alia*, that the law only requires committees to report disbursements to immediate vendors, JA 136-39; that American Made was technically a "separate and distinct legal entit[y]" from the Campaign operating pursuant to a non-exclusive

11

contract, JA 148; and that some past campaigns had allegedly similarly contracted with clearinghouse vendors, JA 130-32, JA 149-51.

**B. The FEC's Office of General Counsel recommends finding reason to believe and opening an investigation.**

Upon reviewing the administrative complaint, its supplement, and the responses, the General Counsel recommended that the Commission find reason to believe that (1) the Trump Campaign "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b) by misreporting the payees of payments made to [American Made] and Parscale Strategy," (2) the Trump MAGA Committee "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b) by misreporting the payees of payments made to [American Made]," and (3) the Trump Campaign "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b) by misreporting the purpose of payments made to Parscale Strategy." JA 197; *see also* JA 21-23.

In its written report accompanying this recommendation, the General Counsel first explained that there was reason to believe the Committees "improperly failed to itemize[] [American Made]'s payments to subvendors in connection with their disclosures of more than three quarters of a billion dollars ($781,584,527.57) in disbursements." JA 186; JA 182-92. The General Counsel determined that the Committees' lack of an arm's-length relationship with American Made and use of the firm as a conduit for subvendor payments required the Committees to report the ultimate payees of those disbursements, emphasizing that American Made received

12

significant shares of the Committees' overall disbursements, was created and run by Campaign staff, and appeared to have been "created to serve the needs of the Trump [Campaign]," JA 186-87; moreover, the Committees and the Republican National Committee (a participant in the Trump MAGA joint-fundraising committee, JA 187), appeared to be American Made's only clients, and several of the supposed subvendors paid through American Made appeared in fact to have been hired or controlled by the Campaign, JA 187-88. The General Counsel also considered and rejected the Committees' arguments that they were not required to report their ultimate payees because their use of American Made assertedly followed historical practice and because American Made was a distinct legal entity. JA 188-190.

In recommending that the Commission find reason to believe that the Trump Campaign misreported the payees of disbursements to Parscale Strategy, the General Counsel cited FEC precedent that "a committee should disclose salary payments to specific, individually identified employees" and that, regardless, a committee must report payments to subvendors when the initial recipient of the funds is "merely a conduit for the intended recipient." JA 190. Moreover, the record indicated that "Parscale Strategy was used [as] a pass-through to conceal" salary payments to Campaign staff, including Kimberly Guilfoyle and Lara Trump, that "should have been reported as salary payments to the ultimate individual payees." JA 191. *See also* JA 19, 22-23.

Finally, the General Counsel's report explained that the record established reason to believe that the Trump Campaign failed to accurately disclose the purposes of disbursements to Parscale Strategy, further noting that these facts were closely analogous to those in a matter involving the Democratic National Committee ("DNC") recently investigated and settled by the Commission. JA 192-96.

### C. The Commissioners reject the General Counsel's reason-to-believe recommendation, decline to dismiss as a matter of prosecutorial discretion, dismiss the complaint, and issue Statements of Reasons.

On May 10, 2022, by a deadlocked vote of 3-3, the Commission failed to approve the General Counsel's recommendations, falling short of the four affirmative votes required to find reason to believe that the Committees had violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b). *See* JA 221-22. Also on May 10, the Commission failed by 3-3 votes to dismiss the allegations as an exercise of prosecutorial discretion under *Heckler*, *see* JA 222, and to find reason to believe that the Trump Campaign and its treasurer had "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b) by misreporting the purpose of payments made to Parscale Strategy," JA 223. Finally, again on May 10, the Commission voted by a 4-2 margin to "[c]lose the file," thereby dismissing the matter. JA 223. By letter dated May 16, 2022, the Commission notified plaintiff that it had closed the file and dismissed plaintiff's complaint. JA 24.

14

On June 9, 2022, the three Commissioners who voted against finding reason to believe issued a Statement of Reasons explaining the basis for their votes. *See* JA 224-36. These Commissioners justified their decision as compelled by their analyses of the complaint's legal and factual merits, which in turn depended on the imposition of an impermissibly stringent legal and evidentiary standard.

In particular, the Commissioners summarily rejected the General Counsel's conclusion that the Committees were required to disclose the ultimate payees of disbursements made through American Made and Parscale Strategy, eschewing the careful analysis dictated by FEC precedent and broadly declining to credit the available evidence. *See, e.g.*, JA 24-25 (noting Commissioners' determinations that subvendor reporting would not be required absent proof "the committee has previously instructed the payee to pass payments along to a third party that was not involved in the provision of services by the payee" and/or that the reported vendor was deliberately used as a conduit "only out of a desire to conceal payments" to the ultimate subvendor). The Commissioners also concluded that use of a single clearinghouse vendor like American Made was "unremarkable" and consistent with the "historical practice" of past campaigns, arguing that the Commission had silently "acquiesce[d]" in the practice. JA 230-31.

The Commissioners then purported to reframe the same legal and factual analyses as an exercise of prosecutorial discretion. In particular, the Commissioners

reiterated their views of the complaint's merits and stated that because "the law does not require" subvendor reporting on these facts and there was "insufficient factual or legal support for [the General Counsel]'s theory of enforcement," pursuing the matter was unwarranted. JA 235. They also characterized the FEC's own regulations as "uncertain," JA 235, again referencing past campaigns' use of supposedly similar vendor arrangements and citing an inapposite rulemaking petition filed by Campaign Legal Center, which seeks to expand current subvendor reporting requirements to apply to a broader range of vendor relationships than those at issue here, JA 27.

Two of the three Commissioners who voted to approve the General Counsel's reason-to-believe recommendation also issued a Statement of Reasons explaining their votes. *See* JA 237-41. These Commissioners found that the "meticulously documented" administrative complaint alleged the concealment of "exactly the type of information the FECA is intended to expose to the sunlight of disclosure." JA 240. They rejected the no-voting Commissioners' "attempt to discredit news reports as appropriate sources of information for complaints," JA 240, and further noted that the dismissal continued former President Trump's "remarkable win streak before th[e] Commission," during which "the FEC has received more than 40 complaints involving Donald Trump or his committee" but conducted "a grand total of zero" investigations, departing from the General Counsel's recommended reason-to-believe finding in "at least 24" of those matters, JA 237.

16

As the dissenting Commissioners further highlighted, "the dismissal came shortly after the Commission *did*" pursue enforcement against another respondent based on analogous but "less egregious" subvendor reporting violations, raising concerns about fairness and consistent treatment under the law. JA 239, 241 ("The major difference, excluding the parties, is that the DNC case involved a tiny fraction of the amount of money at issue in this matter."). The Commissioners concluded that the complaint's dismissal would "damag[e] . . . the integrity of America's campaign-finance process." JA 241.

One dissenting Commissioner issued a supplemental Statement of Reasons on July 14, 2022, further explaining why, in her view, the invocation of prosecutorial discretion in the controlling Statement was ineffective; in it, she stated that those Commissioners not only lacked the authority to invoke discretion because the full Commission had expressly voted not to do so, but also based their assertion of discretion entirely on a legal analysis of the complaint's merits. JA 242-46.

## III.    Proceedings Below

On March 29, 2022, after the FEC had failed to act on the administrative complaint for over twenty months (and its supplement for over fourteen months), Campaign Legal Center filed suit in the district court to challenge the Commission's inaction as unlawful under the Act. *See* Compl., *Campaign Legal Ctr. v. FEC*, No. 1:22-cv-838 (D.D.C. Mar. 29, 2022); *see also* 52 U.S.C. § 30109(a)(8)(A)

(authorizing suit by administrative complainant to challenge FEC delay). Only after Campaign Legal Center took the agency to court did the Commission finally act on the administrative complaint. *See* JA 223. Campaign Legal Center voluntarily dismissed the delay suit on May 19, 2022, after receiving notice that the Commission had dismissed its administrative complaint. *See* Minute Order, *Campaign Legal Ctr. v. FEC*, No. 1:22-cv-838 (D.D.C. May 19, 2022).

Thereafter, Campaign Legal Center filed this action in the district court on July 8, 2022, challenging the dismissal of its administrative complaint as contrary to law. JA 5-30. On September 12, 2022, Defendant FEC moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), asserting that judicial review is unavailable where the Commission exercises prosecutorial discretion and that, in this case, the Commission effectively did so. Likewise on September 12, 2022, the FEC sought and was granted leave to defer transmission of the administrative record and filing of the certified list of its contents pending resolution of its motion to dismiss.

In opposing the FEC's motion to dismiss, plaintiff argued that the dismissal is reviewable for at least three reasons: first, the Commission expressly voted against authorizing any exercise of prosecutorial discretion, and the three Commissioners on the losing side of that vote had no authority to invoke discretion as a basis for dismissal; second, the dismissal was exclusively founded upon legal analysis; and

18

third, the FEC had offered no other basis to preempt judicial review, and its motion relied on decisions that are inconsistent with prior Supreme Court and Circuit precedent. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 14-28 (D.D.C. Sept. 26, 2022) (ECF No. 15). Plaintiff further argued that cutting off all review at the pleadings stage, when the FEC had yet to produce the full administrative record, was inappropriate. *See id.* at 26-27.

On December 8, 2022, the district court issued a memorandum opinion and order granting the FEC's motion to dismiss and dismissing the case without prejudice. JA 31-49. This appeal timely followed. JA 50.

## SUMMARY OF ARGUMENT

The district court's determination that judicial review is precluded in this case was wrong for at least two independent reasons. First, the district court erroneously concluded that *Commission on Hope* and *New Models* preclude judicial review here. Neither of those decisions bars the review of FEC dismissals, like the one challenged here, that are premised on the Commission's substantive legal determinations. Second, even if the holdings in those decisions were applicable in this case, they still should not be followed because they conflict with controlling precedent from the Supreme Court and this Circuit. The dismissal of plaintiff's administrative complaint against the Trump Committees is thus reviewable in either event.

**1.** As both *New Models* and *Commission on Hope* recognized, the mere invocation of prosecutorial discretion does not "shield the Commission's decision from judicial review . . . [where] the Commission ha[s] not relied on it," *New Models*, 993 F.3d at 893-94, nor where the controlling Commissioners "reference[d] their merits analysis as a ground for exercising prosecutorial discretion," *CREW v. FEC*, 55 F.4th 918, 920-21 (D.C. Cir. 2022) ("*New Models II*") (Rao, J., concurring in denial of rehearing en banc) (citation omitted).

So too here. Following the path of the controlling Commissioners' reasoning as provided in their Statement of Reasons admits but one conclusion: the dismissal was based on their assessments of the law and evidence, not discretion. The Commissioners in no way "relied on" discretionary factors to dismiss plaintiff's administrative complaint, but rather simply characterized their conclusive legal determinations on the merits as an exercise of "prosecutorial discretion." The district court all but acknowledged as much. *See* JA 47 ("[T]he controlling Commissioners' invocation of prosecutorial discretion is closely intertwined with—if not dependent on—[their] legal analysis.").

That the Commissioners framed their legal conclusions in terms of "prosecutorial discretion" is not sufficient to negate FECA's express provision for judicial review. *See* 52 U.S.C. § 30109(a)(8). Even on their own terms, the Commissioners' stated concerns about the factual record or the prospects for any

20

investigation cannot be disentangled from the Commissioners' underlying reliance on an impermissible and unduly exacting substantive standard. The district court thus erred in presuming that the Commissioners' supposed discretionary concerns would stand apart from their legal analysis in the event of a contrary-to-law ruling and remand to the agency.

In *New Models*, by contrast, "prosecutorial discretion [was] exercised *in addition to the legal grounds*," 993 F.3d at 887 (emphasis in original); the decision thus provides no basis to hold this dismissal unreviewable. Indeed, since the ruling below, four members of this Court, including the author of the *New Models* majority opinion, again confirmed that under *New Models* an FEC dismissal is unreviewable where the controlling Commissioners "relied on an *independent* ground of prosecutorial discretion," and not where their asserted exercise of prosecutorial discretion depends on or "reference[s] their merits analysis." *New Models II*, 55 F.4th at 920-21 (Rao, J., concurring in denial of rehearing en banc) (emphasis added) (citation omitted). Even under the "quite capacious rule" articulated in *New Models*, JA 46, in other words, the dismissal here is reviewable.

**2.** The district court's incorrect holding to the contrary only further exposes the conflict between the *CREW* decisions and controlling Supreme Court and Circuit precedent, including *FEC v. Akins*, 524 U.S. 11 (1998); *Akins v. FEC*, 101 F.3d 731, 734 (D.C. Cir. 1996) (en banc), *vacated on other grounds*, *FEC v. Akins*, 524 U.S.

11 (1998); *Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995); *Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131 (D.C. Cir. 1987) ("*DCCC*"); and *Orloski*, 795 F.2d 156. *See also New Models*, 993 F.3d at 900-01 (Millett, J., dissenting); *Campaign Legal Center & Democracy 21 v. FEC*, 952 F.3d 352, 363 (D.C. Cir. 2020) (Edwards, J. concurring); *CREW v. FEC*, 923 F.3d 1141, 1145 (D.C. Cir. 2019) ("*Commission on Hope II*") (Pillard, J., dissenting from denial of rehearing en banc). The general presumption of unreviewability established in *Heckler* was premised on the fact that agency enforcement decisions have "traditionally" been committed to agency discretion. Here, however, FECA's judicial review provision "explicitly indicates the contrary." *Akins*, 524 U.S. at 26.

As the Supreme Court's decision in *Akins* and the well-established law of this Circuit thus make clear, FEC Commissioners cannot simply dress their legal determinations in "discretionary" garb and thereby defeat all scrutiny. *New Models* and *Commission on Hope* provide no authority for negating judicial review in this manner where—as recognized repeatedly in the decisions of the Supreme Court and this Circuit—Congress expressly overrode any presumption of unreviewability. *See Akins*, 524 U.S. at 26; *Akins*, 101 F.3d at 734; *Chamber of Commerce*, 69 F.3d at 603 ("[FECA] is unusual in that it permits a private party to challenge the FEC's decision *not* to enforce."); *DCCC*, 831 F.2d at 1133-34 (finding decision not to enforce based on "prosecutorial discretion" reviewable).

Accordingly, even insofar as *New Models* and *Commission on Hope* could be construed to hold that judicial review is preempted here, those decisions still cannot supersede Supreme Court and prior Circuit precedent directing the opposite—authorities to which *Commission on Hope* and *New Models* must either conform or yield. *See Sierra Club*, 648 F.3d at 854 ("[W]hen a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail."). Either way, the dismissal of plaintiff's administrative complaint is reviewable under FECA's contrary-to-law standard, and the district court's finding otherwise was in error. The decision below should be reversed.

## STANDING

Plaintiff has standing to sue because it has suffered a "quintessential" informational injury and "set[ting] aside" the agency decision would "likely redress [its] injury in fact." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 784, 793 (D.C. Cir. 2022).

"The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." *Democracy 21*, 952 F.3d at 356 (citation omitted). The dismissal of Campaign Legal Center's administrative complaint has deprived it of statutorily

required disclosure information under FECA—information upon which plaintiff depends to fulfill its mission and programmatic goals, *see* JA 9-10—regarding upwards of three-quarters of a billion dollars that the Trump Committees funneled through conduits to undisclosed subvendors and staff. JA 8, 16-18, 20.

And, were Campaign Legal Center to succeed on the merits of its claim, the Committees would be obligated to itemize their ultimate payees and accurately describe the purposes of those payments. Plaintiff's informational injury is thus indistinguishable from that recognized in *Akins*—and as such, "easily satisf[ies] the causation and redressability requirements of Article III standing." *Campaign Legal Ctr.*, 31 F.4th at 784 (citing *Akins*, 524 U.S. at 21).

## STANDARD OF REVIEW

This Court reviews "de novo the district court's grant of a motion to dismiss for failure to state a claim." *Stop This Insanity Inc. Emp. Leadership Fund v. FEC*, 761 F.3d 10, 13 (D.C. Cir. 2014); *Sierra Club*, 648 F.3d at 854-55. A complaint should not be dismissed if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

### I.   The district court erred in holding the dismissal of plaintiff's administrative complaint unreviewable.

There is a "'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). That imperative applies with even more force in statutory settings, such as this one, where Congress has expressed its "clear intent" to make judicial review available. *Commission on Hope II*, 923 F.3d at 1142 (Griffith, J., concurring in denial of rehearing en banc). And, as FECA and this Court's precedents firmly establish, the FEC's dismissal of an enforcement complaint—unlike the nonenforcement decisions of many other administrative agencies—is subject to review for legal error under 52 U.S.C. § 30109(a)(8).

The district court's holding to the contrary relied on the recent divided panel decisions in *Commission on Hope*, 892 F.3d at 440-42, and *New Models*, 993 F.3d at 884-85, but its reliance was misplaced. Neither *New Models* nor *Commission on Hope* requires departing from those principles here. Although these cases held that certain FEC dismissals premised on prosecutorial discretion are unreviewable, they clarified that the mere invocation of prosecutorial discretion will not "shield the Commission's decision from judicial review . . . [where] the Commission has not relied on it." *New Models*, 993 F.3d at 893-94.

And here, the controlling Commissioners in no way "relied on" prosecutorial discretion; every rationale provided in their Statement of Reasons is bound up with their reviewable legal conclusions regarding FECA, agency authority, and the evidentiary record. The district court was thus wrong in concluding that it could not review the FEC's decision. That conclusion was based on a misreading of this Court's precedents and should be corrected.

## A. Neither *Commission on Hope* nor *New Models* bars review of FEC dismissals premised on legal interpretation.

Contrary to the district court's view that *Commission on Hope* and *New Models* "foreordained" its finding of nonreviewability, JA 45, the *CREW* cases do not preclude judicial review of the legal errors in the FEC dismissal challenged here. Instead, those decisions specifically distinguished dismissals based on *independent* discretionary grounds from those based on legal interpretation, reaffirming that the latter—including dismissals that ground a supposed exercise of prosecutorial discretion on merits analysis—remain reviewable. In contrast to *Commission on Hope* and *New Models*, which involved matters where Commissioners had invoked discretion irrespective of any merits judgments, here the Commissioners' references to prosecutorial discretion were directly founded upon, and are inseparable from, their erroneous legal conclusions.

*Commission on Hope* states clearly that "[t]he interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion." 892 F.3d at

26

441 n.11 (citing *Heckler*, 470 U.S. at 833 n.4 and *Akins*, 524 U.S. at 26). "Thus, if the Commission declines to bring an enforcement action on the basis of its interpretation of FECA, the Commission's decision is subject to judicial review to determine whether it is 'contrary to law.'" *Id.* (citing *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981)). In this way, *Commission on Hope* drew an important distinction between dismissals for purely discretionary reasons, as to which the majority reasoned there would be no standards by which to judge the agency action, and dismissals grounded in legal interpretation, the review of which goes to the core of the judicial function. The FEC dismissal in *Commission on Hope* fell squarely in the former camp; the panel majority determined that it was unreviewable because the controlling rationale rested entirely on discretionary grounds, including that the entity named in the complaint no longer existed, had no money or counsel, and was effectively "defunct" so it could not be legally bound. *See* 892 F.3d at 438.

*New Models*, too, even as it extended the holding in *Commission on Hope*, affirmed the reviewability of cases in which there was no exercise of discretion independent of the Commissioners' legal analysis. 993 F.3d at 884 (noting that a dismissal is reviewable if it "rests solely on legal interpretation"). Unlike here, in *New Models*, "[t]he Commission's decision to dismiss CREW's complaint against New Models rested on two *distinct* grounds: the Commission's interpretation of

27

FECA and its 'exercise of . . . prosecutorial discretion.'" *Id.* (emphasis added). In dismissing CREW's administrative complaint against New Models, the Commissioners had cited the "fact that the organization appears no longer active" as a distinct basis to decline enforcement, irrespective of their legal conclusions regarding the FECA violations at issue. *Id.* at 883. Because that invocation of discretion, while perfunctory, was also fully disconnected from the Commissioners' legal analysis, the *New Models* majority concluded that it lacked any standards by which to review the decision.

The district court here was nevertheless "not persuaded that the Statement in *New Models* clearly invoked prosecutorial discretion as an *independent* ground for dismissal." JA 48. But only days after the district court's ruling below, four members of this Court, including the author of the *New Models* majority opinion, removed any lingering doubt on that question. In an opinion concurring in the denial of a petition to rehear *New Models* en banc, Judge Rao again confirmed that the FEC dismissal at issue in *New Models* was unreviewable because the controlling Commissioners "relied on an *independent* ground of prosecutorial discretion," *New Models II*, 55 F.4th at 921 (emphasis added)—and that the Commissioners' asserted exercise of prosecutorial discretion had not rested on or "reference[d] their merits analysis," *id.* at 920 (citation omitted).

28

Here, in contrast, the Commissioners' references to prosecutorial discretion were expressly linked to their erroneous legal conclusions. Both *CREW* decisions specifically affirmed the reviewability of FEC dismissals justified based on interpretations of law, *Commission on Hope*, 892 F.3d at 441 n.11—including instances where the Commissioners invoke prosecutorial discretion but "reference[] their merits analysis as a ground for exercising" it, *New Models II*, 55 F.4th at 920 (Rao, J., concurring in denial of rehearing en banc) (citation omitted). Far from resting on prudential considerations beyond the courts' capacity to judge, therefore, this dismissal hinged on the kind of legal decisionmaking that forms the heartland of judicially reviewable agency action—and neither *CREW* decision insulates it from scrutiny.

## B. The dismissal here is reviewable because the Commissioners' purported exercise of prosecutorial discretion cannot be disentangled from their legal conclusions on the merits.

The supposed invocation of discretion here is materially different from those in the *CREW* cases. *Commission on Hope* and *New Models* involved FEC dismissals justified on discretionary grounds independent of any legal analysis—namely, conclusions that enforcement would be futile because the respondent groups had become defunct during the matters' pendency—thus furnishing an independent and alternative rationale for dismissal irrespective of any merits analysis. Indeed, the

29

statement in *Commission on Hope* "provided no legal analysis at all." *New Models*, 993 F.3d at 905 (Millett, J., dissenting).

The same cannot be said here. In this case, the naysaying Commissioners did not exercise discretion independently of their legal conclusions about the scope of FECA disclosure requirements or their authority to consider credible and unrebutted record evidence; rather, they simply characterized as an exercise of discretion their decision not to proceed *because of* those legal conclusions. Their decision is thus readily distinguishable from the *CREW* cases, and not entitled to the exception from FECA's judicial review provision those cases recognized.

1.  **The dismissal rested on substantive legal and factual analysis.**

The dismissal here is reviewable because each of the putative discretionary justifications asserted by the controlling Commissioners was expressly dependent upon legal and factual judgments about the allegations in the complaint. Although the Commissioners couched their rationale in superficially prudential terms, such "magic words" cannot manifest independent discretionary justifications where none exist. Any "practical" considerations the Commissioners ultimately cited to justify the dismissal—and the district court credited as sufficient to preclude review of their legal reasoning, JA 47-48—cannot be construed as anything but an endpoint of the Commissioners' merits analysis.

This conclusion follows inexorably from the Commissioners' own words. The controlling Commissioners repeatedly stated that they were exercising "discretion" to dismiss the complaint *because of* their reason-to-believe analysis. *See* JA 224, 235-36. Indeed, in explaining their decision to reject the General Counsel's finding that the Trump Campaign failed to adequately describe the purpose of payments made through Parscale Strategy, the Commissioners did not even attempt to characterize their reasoning as resting on anything other than a legal judgment about whether enforcement was legally permissible, concluding: "in the purpose-reporting context, the Commission may enforce where a 'person reading the Committee's disclosure reports could not have discerned [why] the Committee was disbursing funds,' which is plainly not the case here." JA 235. As with their supposed "exercise of prosecutorial discretion" in general, the Commissioners just recapitulated their merits conclusion and then claimed to employ discretion on that basis. The *CREW* decisions do not shield those underlying merits conclusions from review for legal error.

And while the controlling Commissioners' rationale was indeed plagued by legal error, this Court need only decide the threshold question of whether those errors can be subjected to contrary-to-law review under FECA at all. The Statement of Reasons confirms that they can. In it, the Commissioners opined at length about why they believed the record showed an "absence of support for enforcement," JA 235,

31

and why they thought the General Counsel's reason-to-believe recommendation should be rejected because it was based on what they viewed as a "flaw[ed]" or "tenuous legal theory," JA 224, 234—legal conclusions that explicitly turned on the Commissioners' own contrary analyses of statutory and regulatory reporting requirements, prior FEC precedent, and the standard of proof required at the very earliest stage of FEC enforcement proceedings, *see* JA 227-34. Indeed, the Commissioners found definitively that the Trump Committees were not required to disclose the ultimate payees of any disbursements routed through American Made and Parscale Strategy, *see* JA 232-33, and then stated in conclusory fashion: "For the reasons given above, we find insufficient factual or legal support for [the General Counsel]'s theory of enforcement and do not believe the Commission would ultimately be successful in pursuing it." JA 235. *See also, e.g.*, JA 224 (opining that "the legal support for enforcement here is remarkably thin").

The controlling Commissioners thus made clear that their asserted exercise of prosecutorial discretion rested on their dispositive legal assessment of the complaint on the merits. And, rather than providing a distinct basis for this purported "discretionary" exercise, the Commissioners merely reiterated their legal conclusions as the reason they felt compelled to invoke discretion and dismiss the complaint. Of course, having already (erroneously) decided that "the law does not require" subvendor reporting on the facts presented in the administrative complaint,

JA 235, the Commissioners had little choice but to conclude that further enforcement action was unwarranted. Their resort to a "discretionary" rationale that was the logical endpoint of their merits analysis does not immunize the Commissioners' legal errors from scrutiny. Instead, as even *New Models* confirmed, an FEC dismissal citing prosecutorial discretion remains reviewable where, as here, the controlling Commissioners "reference[d] their merits analysis as a ground for exercising" it. *New Models II*, 55 F.4th at 920 (Rao, J., concurring in denial of rehearing en banc) (citation omitted).

### 2. The district court erred in presuming that the Commissioners' invocation of prosecutorial discretion would stand independently of their merits judgments.

Because the controlling Commissioners' supposed exercise of prosecutorial discretion expressly hinged upon and was "entwined with" their merits analysis, the district court erred in presuming the agency would exercise discretion to dismiss the administrative complaint even if their legal conclusions were to be corrected or altered through judicial review. Consistent with the Supreme Court's holding in *Akins*, the dismissal remains reviewable—for "we cannot know," given the contingency of the Commissioners' reasoning, "that the FEC would have exercised its prosecutorial discretion in this way" if the Commissioners' dispositive legal conclusions were held contrary to law. 524 U.S. at 25. The role of the courts is to "correct[] a legal error—if error is committed—in the agency decision," provided

33

the error is "one upon which the agency decision rests." *Akins*, 101 F.3d at 738 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)). The asserted exercise of prosecutorial discretion here was by no means sufficiently "independent of pure legal inquiry" to preclude the district court from performing that role. JA 47.

Indeed, the district court's characterization that any of the Commissioners' stated grounds for exercising discretion were "independent of pure legal inquiry," JA 47, ignores what they actually said. In particular, the lower court placed heavy emphasis on the Commissioners' claim that "'the size and scope of the proposed investigation' . . . could consume a disproportionate amount of FEC resources." JA 47. But the court's assumption that this "practical" concern "stands apart from" the Commissioners' underlying legal analysis, JA 47-48, was erroneous and improper.

The Commissioners' asserted agency resource concerns are impossible to separate from their underlying judgment that there was "insufficient factual or legal support" to move forward, JA 235—a conclusion they likewise only reached after applying an impermissibly strict substantive legal standard and improperly disregarding much of the existing factual record. Specifically, the Commissioners refused to consider undisputed evidence derived from published news reports drawing on unnamed sources, *see* JA 231-32, and interpreted the relevant statutory and regulatory disclosure provisions as requiring subvendor itemization only upon a showing that the named vendor served exclusively as a pass-through for the

Committees' disbursements to subvendors, JA 229-32, "in an attempt to disguise the intended recipient of the funds," JA 230. But that invented "attempt to disguise" standard is not an actual legal requirement; indeed, it is contrary to the relevant statutory and regulatory standards, and wholly at odds with the transparency interests underlying FECA's disclosure provisions. Likewise, the Commissioners' assertion that FEC regulations are "uncertain," JA 235, ignores the FEC's own precedent, and relies on a mischaracterization of a pending rulemaking petition that specifically seeks to expand the FEC's current subvendor reporting requirements so they apply *beyond* the circumstances of this case, *see supra* at 16; JA 27.

Absent the Commissioners' application of those improper legal and evidentiary tests, it is impossible to know whether their stated concerns about "the size and scope of the proposed investigation" would still obtain, JA 235—and the district court erred by presuming it knew the answer to that question. *See Int'l Union, United Mine Workers v. Dep't of Labor*, 358 F.3d 40, 44-45 (D.C. Cir. 2004) (holding agency action arbitrary and capricious where two of its three stated reasons were invalid and the Court did "not know—nor [was it] free to guess—what the agency would have done had it realized that it could not justify its decision" on those two grounds). "Whether [the Commissioners] would have chosen to rest" on their asserted discretionary grounds "if their legal basis for dismissal had been deemed

invalid is an open question for the Commission to answer on remand." *New Models II*, 55 F.4th at 929 (Millett, J., dissenting from denial of rehearing en banc).

Indeed, contrary to the Commissioners' generalizations about the necessary scope of any investigation, the Office of General Counsel had proposed a "targeted investigation" and characterized the existing, *pre*-investigatory record as already "strongly indicative of the type of direct subvendor relationship that the Commission has previously found a committee is required to disclose." JA 189, 197. Like the rest of the Commissioners' supposedly discretionary justifications for dismissal, therefore, the "practical" concerns highlighted below were not independent of the Commissioners' faulty legal determinations, but a direct result of them.[3] The district court thus erred in concluding that "some, even if not all, of the controlling Commissioners' invocation of *Heckler*" rested on purely prudential considerations both separable from their legal analysis and sufficient to cut off all review. JA 47.

## II. The district court relied on decisions that are contrary to fixed law and should not be followed.

As explained above, the dismissal here is reviewable for the reasons reserved by the panel majorities in *Commission on Hope* and *New Models*: because the

---

[3] The Commissioners also failed to address other significant and uncontested factual allegations—for example, the evidence that Campaign staff created American Made to benefit the Campaign, that the firm existed solely to benefit the Committees, and that the Committees directly worked with and supervised subvendors and staff paid through American Made and Parscale Strategy. *See* JA 78-80, 88-89.

controlling Commissioners rested their decision on conclusions of law, *Commission on Hope*, 892 F.3d at 439, and their invocation of discretion was not "distinct" from those conclusions, *New Models*, 993 F.3d at 884. But if the Court finds that the *CREW* decisions do apply here, the decisions should not be followed because they conflict with directly applicable Supreme Court and prior Circuit precedent. Under the law of this Circuit, "when a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail." *Sierra Club*, 648 F.3d at 854.

Indeed, *Commission on Hope* and *New Models* both relied on the premise that FEC nonenforcement decisions are "control[led]" by *Heckler* and its presumption that agency nonenforcement decisions are unreviewable. *Commission on Hope*, 892 F.3d at 439. But that premise was flatly rejected by the Supreme Court in *Akins* and is contrary to the long-established law of this Circuit. As the Supreme Court recognized in *Akins*, FECA "explicitly indicates the contrary." 524 U.S. at 26. By providing for judicial review and a limited private right of action, Congress specifically intended to move FEC nonenforcement decisions out of the *Heckler* framework and subject them to judicial oversight. Therefore, as *Akins* held, the "traditional[]" presumption that nonenforcement decisions are "committed to agency discretion" is squarely rebutted by FECA. *Id.* at 26.

37

Decades of Circuit precedent reviewing FEC dismissals under FECA § 30109(a)(8) confirm this understanding. *See Akins*, 101 F.3d at 734 (distinguishing *Heckler* and noting that FECA Section 30109(a)(8) "is an unusual statutory provision which permits a complainant to bring to federal court an agency's refusal to institute enforcement proceedings"); *Chamber of Commerce*, 69 F.3d at 603 ("[FECA] is unusual in that it permits a private party to challenge the FEC's decision *not* to enforce."); *DCCC*, 831 F.2d at 1133-35 & n.5 (recognizing both 6-0 and 3-2-1 decisions not to enforce based on "prosecutorial discretion" as reviewable, and declining to "confin[e] the judicial check [in § 30109(a)(8)(C)] to cases in which . . . the Commission acts on the merits"); *Orloski*, 795 F.2d 156 (recognizing FEC dismissals can be contrary to law either because they rest on impermissible interpretations of law or are otherwise arbitrary, capricious, or an abuse of discretion). Indeed, under this Court's longstanding FECA precedents predating the *CREW* cases, "a decision dismissing a complaint 'is contrary to law' even 'under a permissible interpretation of the statute' if it involves 'an abuse of discretion.'" *Commission on Hope II*, 923 F.3d at 1147 (Pillard, J., dissenting from denial of rehearing en banc) (quoting *Orloski*, 795 F.2d at 161).

Given this clear authority, even the FEC itself—at least before *Commission on Hope*—had recognized "that when FEC Commissioners purport to invoke prosecutorial discretion in dismissing a complaint, the matter in dispute is subject to

judicial review." *Democracy 21*, 952 F.3d at 361 (Edwards, J., concurring) (citing the FEC's briefing in *Commission on Hope*). But the agency has since retreated from that position on reviewability, arguing instead, as it has in this case, for an automatic and all-encompassing immunity under *Heckler* that it had previously and correctly "eschewed." *Id.* at 362 (admonishing the FEC for "ignor[ing] *Akins* and abandon[ing] (without explanation) the position that it presented to the court in [*Commission on Hope*]").

Predictably, the *CREW* cases' radical departure from Circuit precedent has already generated significant confusion, inconsistency, and conflict since the first panel ruling in *Commission on Hope*. *Compare, e.g.*, *Democracy 21*, 952 F.3d at 356 (declining to decide whether to follow *Commission on Hope* and proceeding to consider the merits of a "discretionary" dismissal), *Lieu v. FEC*, 370 F. Supp. 3d 175, 183 (D.D.C. 2019) (noting that "FECA's express provision for the judicial review of FEC dismissal decisions" rendered *Heckler* "inapposite"), *and CREW v. FEC*, 316 F. Supp. 3d 349, 421-22 (D.D.C. 2018) (same), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020), *with CREW v. Am. Action Network*, 590 F. Supp. 3d 164, 173 (D.D.C. 2022) (dismissing citizen suit on reconsideration of defendant's motion to dismiss following *New Models*, reversing initial ruling that "FEC dismissals based on [prosecutorial] discretion rooted entirely in legal conclusions are reviewable" under *Commission on Hope*), *appeal docketed*, No. 22-7038 (D.C. Cir. Mar. 31, 2022);

*Pub. Citizen v. FEC*, 547 F. Supp. 3d 51, 54-55 (D.D.C. 2021) (declining to review FEC dismissal where a single footnote in the controlling Statement[4] merely "note[d] that the Commission maintains broad discretion" that it "could" have applied).

This history belies the suggestion in *New Models* that "*Commission on Hope* readily conforms with [the Court's] earlier cases." 993 F.3d at 893. Instead, as multiple members of this Court have now noted in concurrence and dissent, the expansive nonreviewability rule articulated in both *CREW* cases is contrary to Congress's mandate in Section 30109(a)(8), "opens the door to the dangerously easy evasion of judicial review and is contrary to law." *Id.* at 905 (Millett, J., dissenting); *see also New Models II*, 55 F.4th at 926 (Millett, J., dissenting from denial of rehearing en banc) ("As Judge Griffith worried, Judge Pillard predicted, and Judge Edwards has since echoed, the *Commission on Hope* chickens have come home to roost. The court's decision in this case renders for naught statutorily mandated judicial review."); *Democracy 21*, 952 F.3d at 360 (Edwards, J., concurring) ("[T]he Supreme Court has made it clear that the commands of *Heckler v. Chaney* . . . do not apply to matters in which a complainant seeks review of Commission actions under [FECA]."); *Commission on Hope II*, 923 F.3d at 1142 (Griffith, J., concurring in

---

[4] *See* Statement of Reasons of Chair Lee Goodman & Comm'rs Caroline C. Hunter and Matthew S. Petersen, MUR 6396 (Crossroads GPS) (Jan. 8, 2014), https://www.fec.gov/files/legal/murs/6396/14044350970.pdf.

denial of rehearing en banc); *Commission on Hope*, 892 F.3d at 442 (Pillard, J., dissenting).

* * *

Reversal here avoids adding to this disharmony within the Court's FECA precedents. The district court held the dismissal of plaintiff's administrative complaint unreviewable based on decisions that conflict with governing Supreme Court and Circuit precedent and the carefully balanced statutory scheme devised by Congress. While the lower court felt "bound" to reach the result it did under "*New Models*'s quite capacious rule," JA 46, 49, this Court need not. Because "[t]he law of the circuit is clear . . . [and] was well established long before the decision in [*Commission on Hope*]," *Democracy 21*, 952 F.3d at 362 (Edwards, J., concurring) (citations omitted), it is that prior law that must be given effect, *see Sierra Club*, 648 F.3d at 854. At a minimum, however, *New Models*'s "capacious" rule should not be further extended—nor its conflict with Circuit precedent deepened—to bar review of FEC dismissals where, as here, a purportedly discretionary rationale is "entwined" with legal analysis. JA 49. The dismissal of plaintiff's administrative complaint against the Trump Committees is reviewable either way.

## CONCLUSION

For the foregoing reasons, the district court's December 8, 2022 memorandum opinion and order should be reversed, and the case remanded for further proceedings.

**Dated: March 29, 2023**

Respectfully submitted,

*/s/ Megan P. McAllen*

Megan P. McAllen (DC Bar No. 1020509)
Erin Chlopak (DC Bar No. 496370)
Allison Walter (DC Bar No. 90008637)
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
Email: mmcallen@campaignlegalcenter.org
Email: echlopak@campaignlegalcenter.org
Email: awalter@campaignlegalcenter.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This response complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 9,259 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Microsoft Office Word 2016 in Times New Roman 14-point font.

*/s/ Megan P. McAllen*
Megan P. McAllen

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2023, I electronically filed this Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

*/s/ Megan P. McAllen*
Megan P. McAllen

**ADDENDUM**

## ADDENDUM – TABLE OF CONTENTS

**Federal Statutes**

52 U.S.C. § 30104(b) ................................................................1a

52 U.S.C. § 30109(a) ...............................................................5a

**Federal Regulations**

11 C.F.R. § 104.3(b) ..............................................................10a

## UNITED STATES CODE
## TITLE 52. VOTING AND ELECTIONS
### Chapter 301—Federal Election Campaigns
### Subchapter 1—Disclosure of Federal Campaign Funds

\*      \*      \*

## § 30104.      Reporting requirements

**(b) Contents of reports.** Each report under this section shall disclose—

**(1)**      the amount of cash on hand at the beginning of the reporting period;

**(2)**      for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

(A)      contributions from persons other than political committees;

(B)      for an authorized committee, contributions from the candidate;

(C)      contributions from political party committees;

(D)      contributions from other political committees;

(E)      for an authorized committee, transfers from other authorized committees of the same candidate;

(F)      transfers from affiliated committees and, where the reporting committee is a political party committee, transfers from other political party committees, regardless of whether such committees are affiliated;

(G)      for an authorized committee, loans made by or guaranteed by the candidate;

(H)      all other loans;

(I)      rebates, refunds, and other offsets to operating expenditures;

(J)      dividends, interest, and other forms of receipts; and

(K)      for an authorized committee of a candidate for the office of President, Federal funds received under chapter 95 and chapter 96 of Title 26;

**(3)**      the identification of each—

(A)      person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

(B)    political committee which makes a contribution to the reporting committee during the reporting period, together with the date and amount of any such contribution;

(C)    authorized committee which makes a transfer to the reporting committee;

(D)    affiliated committee which makes a transfer to the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds to the reporting committee from another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfer;

(E)    person who makes a loan to the reporting committee during the reporting period, together with the identification of any endorser or guarantor of such loan, and the date and amount or value of such loan;

(F)    person who provides a rebate, refund, or other offset to operating expenditures to the reporting committee in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of such receipt; and

(G)    person who provides any dividend, interest, or other receipt to the reporting committee in an aggregate value or amount in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such receipt;

**(4)**    for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

(A)    expenditures made to meet candidate or committee operating expenses;

(B)    for authorized committees, transfers to other committees authorized by the same candidate;

(C)    transfers to affiliated committees and, where the reporting committee is a political party committee, transfers to other political party committees, regardless of whether they are affiliated;

(D)    for an authorized committee, repayment of loans made by or guaranteed by the candidate;

(E)    repayment of all other loans;

(F)    contribution refunds and other offsets to contributions;

(G)    for an authorized committee, any other disbursements;

(H)    for any political committee other than an authorized committee—

    (i) contributions made to other political committees;

    (ii) loans made by the reporting committees;

    (iii) independent expenditures;

    (iv) expenditures made under section 30116(d) of this title; and

    (v) any other disbursements; and

(I)    for an authorized committee of a candidate for the office of President, disbursements not subject to the limitation of section 30116(b) of this title;

**(5)**    the name and address of each—

(A)    person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet a candidate or committee operating expense, together with the date, amount, and purpose of such operating expenditure;

(B)    authorized committee to which a transfer is made by the reporting committee;

(C)    affiliated committee to which a transfer is made by the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds by the reporting committee to another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfers;

(D)    person who receives a loan repayment from the reporting committee during the reporting period, together with the date and amount of such loan repayment; and

(E)    person who receives a contribution refund or other offset to contributions from the reporting committee where such contribution was reported under paragraph (3)(A) of this subsection, together with the date and amount of such disbursement;

**(6)**    (A)    for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

(B)    for any other political committee, the name and address of each—

    (i)    political committee which has received a contribution from the reporting committee during the reporting period, together with the date and amount of any such contribution;

(ii) person who has received a loan from the reporting committee during the reporting period, together with the date and amount of such loan;

(iii) person who receives any disbursement during the reporting period in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure and a statement which indicates whether such independent expenditure is in support of, or in opposition to, a candidate, as well as the name and office sought by such candidate, and a certification, under penalty of perjury, whether such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such committee;

(iv) person who receives any expenditure from the reporting committee during the reporting period in connection with an expenditure under section 30116(d) of this title, together with the date, amount, and purpose of any such expenditure as well as the name of, and office sought by, the candidate on whose behalf the expenditure is made; and

(v) person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

**(7)** the total sum of all contributions to such political committee, together with the total contributions less offsets to contributions and the total sum of all operating expenditures made by such political committee, together with total operating expenditures less offsets to operating expenditures, for both the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office); and

**(8)** the amount and nature of outstanding debts and obligations owed by or to such political committee; and where such debts and obligations are settled for less than their reported amount or value, a statement as to the circumstances and conditions under which such debts or obligations were extinguished and the consideration therefor.

* * *

## § 30109.    Enforcement

**(a)**   *Administrative and judicial practice and procedure*

    **(1)**   Any person who believes a violation of this Act or of chapter 95 or chapter 96 of Title 26 has occurred, may file a complaint with the Commission. Such complaint shall be in writing, signed and sworn to by the person filing such complaint, shall be notarized, and shall be made under penalty of perjury and subject to the provisions of section 1001 of Title 18. Within 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed such a violation. Before the Commission conducts any vote on the complaint, other than a vote to dismiss, any person so notified shall have the opportunity to demonstrate, in writing, to the Commission within 15 days after notification that no action should be taken against such person on the basis of the complaint. The Commission may not conduct any investigation or take any other action under this section solely on the basis of a complaint of a person whose identity is not disclosed to the Commission.

    **(2)**   If the Commission, upon receiving a complaint under paragraph (1) or on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation of this Act or chapter 95 or chapter 96 of Title 26, the Commission shall, through its chairman or vice chairman, notify the person of the alleged violation. Such notification shall set forth the factual basis for such alleged violation. The Commission shall make an investigation of such alleged violation, which may include a field investigation or audit, in accordance with the provisions of this section.

    **(3)**   The general counsel of the Commission shall notify the respondent of any recommendation to the Commission by the general counsel to proceed to a vote on probable cause pursuant to paragraph (4)(A)(i). With such notification, the general counsel shall include a brief stating the position of the general counsel on the legal and factual issues of the case. Within 15 days of receipt of such brief, respondent may submit a brief stating the position of such respondent on the legal and factual issues of the case, and replying to the brief of general counsel. Such briefs shall be filed with the Secretary of the Commission and shall be considered by the Commission before proceeding under paragraph (4).

    **(4)**   (A)   (i) Except as provided in clauses (ii) and subparagraph (C), if the Commission determines, by an affirmative vote of 4 of its members, that there

is probable cause to believe that any person has committed, or is about to commit, a violation of this Act or of chapter 95 or chapter 96 of Title 26, the Commission shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved. Such attempt by the Commission to correct or prevent such violation may continue for a period of not more than 90 days. The Commission may not enter into a conciliation agreement under this clause except pursuant to an affirmative vote of 4 of its members. A conciliation agreement, unless violated, is a complete bar to any further action by the Commission, including the bringing of a civil proceeding under paragraph (6)(A).

(ii) If any determination of the Commission under clause (i) occurs during the 45-day period immediately preceding any election, then the Commission shall attempt, for a period of at least 15 days, to correct or prevent the violation involved by the methods specified in clause (i).

(B) (i) No action by the Commission or any person, and no information derived, in connection with any conciliation attempt by the Commission under subparagraph (A) may be made public by the Commission without the written consent of the respondent and the Commission.

(ii) If a conciliation agreement is agreed upon by the Commission and the respondent, the Commission shall make public any conciliation agreement signed by both the Commission and the respondent. If the Commission makes a determination that a person has not violated this Act or chapter 95 or chapter 96 of Title 26, the Commission shall make public such determination.

\* \* \*

**(5)** (A) If the Commission believes that a violation of this Act or of chapter 95 or chapter 96 of Title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph (4)(A) may include a requirement that the person involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation.

(B) If the Commission believes that a knowing and willful violation of this Act or of chapter 95 or chapter 96 of Title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph

(4)(A) may require that the person involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

(C)    If the Commission by an affirmative vote of 4 of its members, determines that there is probable cause to believe that a knowing and willful violation of this Act which is subject to subsection (d), or a knowing and willful violation of chapter 95 or chapter 96 of Title 26, has occurred or is about to occur, it may refer such apparent violation to the Attorney General of the United States without regard to any limitations set forth in paragraph (4)(A).

(D)    In any case in which a person has entered into a conciliation agreement with the Commission under paragraph (4)(A), the Commission may institute a civil action for relief under paragraph (6)(A) if it believes that the person has violated any provision of such conciliation agreement. For the Commission to obtain relief in any civil action, the Commission need only establish that the person has violated, in whole or in part, any requirement of such conciliation agreement.

**(6)**    (A)    If the Commission is unable to correct or prevent any violation of this Act or of chapter 95 or chapter 96 of Title 26, by the methods specified in paragraph (4), the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

(B)    In any civil action instituted by the Commission under subparagraph (A), the court may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit (if the relief sought is a permanent or temporary injunction or a restraining order), a violation of this Act or chapter 95 or chapter 96 of Title 26.

(C)    In any civil action for relief instituted by the Commission under subparagraph (A), if the court determines that the Commission has established that the person involved in such civil action has committed a knowing and willful violation of this Act or of chapter 95 or chapter 96 of Title 26, the court may impose a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

**(7)**    In any action brought under paragraph (5) or (6), subpoenas for witnesses who are required to attend a United States district court may run into any other district.

**(8)**    (A)    Any party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1), or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.

(B)    Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal.

(C)    In any proceeding under this paragraph the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint.

**(9)**    Any judgment of a district court under this subsection may be appealed to the court of appeals, and the judgment of the court of appeals affirming or setting aside, in whole or in part, any such order of the district court shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(10)**    Repealed. Pub.L. 98-620, Title IV, § 402(1)(A), Nov. 8, 1984, 98 Stat. 3357

**(11)**    If the Commission determines after an investigation that any person has violated an order of the court entered in a proceeding brought under paragraph (6), it may petition the court for an order to hold such person in civil contempt, but if it believes the violation to be knowing and willful it may petition the court for an order to hold such person in criminal contempt.

**(12)**   (A)   Any notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made.

(B)   Any member or employee of the Commission, or any other person, who violates the provisions of subparagraph (A) shall be fined not more than $2,000. Any such member, employee, or other person who knowingly and willfully violates the provisions of subparagraph (A) shall be fined not more than $5,000.

*     *     *

## CODE OF FEDERAL REGULATIONS
### Title 11—FEDERAL ELECTIONS
### Chapter I—Federal Election Commission
### Subchapter A—General

**§ 104.3    Disclosure of receipt and consumption of in-kind contributions.**

\*    \*    \*

**(b)**    *Reporting of disbursements.* Each report filed under § 104.1 shall disclose the total amount of all disbursements for the reporting period and for the calendar year (or for the election cycle, in the case of an authorized committees) and shall disclose the information set forth at paragraphs (b)(1) through (b)(4) of this section. The first report filed by a political committee shall also include all amounts disbursed prior to becoming a political committee under § 100.5 of this chapter, even if such amounts were not disbursed during the current reporting period.

(1)    *Categories of disbursements for political committees other than authorized committees.* All political committees other than authorized committees shall report the total amount of disbursements made during the reporting period and, except for itemized and unitemized breakdowns, during the calendar year in each of the following categories:

(i)    Operating expenditures;

(A)    Itemized operating expenditures;

(B)    Unitemized operating expenditures;

(C)    Total operating expenditures;

(ii)    Transfers to affiliated committees or organizations and, where the reporting committee is a political party committee, transfers to other political party committees regardless of whether they are affiliated;

(iii)    Repayment of all loans;

(iv)    Offsets;

(A)    Itemized offsets to contributions (including contribution refunds);

(B)    Unitemized offsets to contributions (including contribution refunds);

(C)    Total offsets to contributions;

(v)    Contributions made to other political committees;

(vi)    Loans made by the reporting committee;

(vii)    Independent expenditures made by the reporting committee;

(viii) Expenditures made under 11 CFR part 109, subpart D (52 U.S.C. 30116(d)), See 11 CFR 104.3(a)(3)(iii);

(ix)    Other disbursements;

(A)    Itemized other disbursements;

(B)    Unitemized other disbursements;

(C)  Total other disbursements;

(x)  Total disbursements.

(2)  *Categories of disbursements for authorized committees*. An authorized committee of a candidate for Federal office shall report the total amount of disbursements made during the reporting period and, except for itemized and unitemized breakdowns, during the election cycle in each of the following categories:

(i)  Operating expenditures;

(A)  Itemized operating expenditures;

(B)  Unitemized operating expenditures;

(C)  Total operating expenditures;

(ii)  Transfers to other committees authorized by the same candidate;

(iii)  Repayment of loans;

(A)  Repayment of loans made, guaranteed, or endorsed by the candidate to his or her authorized committee including loans derived from a bank loan to the candidate or from an advance on a candidate's brokerage account, credit card, home equity line of credit, or other lines of credit described in 11 CFR 100.83 and 100.143;

(B)  Repayment of all other loans;

(C)  Total loan repayments;

(iv)  For an authorized committee of a candidate for the office of President, disbursements not subject to the limitations of 11 CFR 110.8 (52 U.S.C. 30116(b));

(v)  Offsets;

(A)  Itemized offsets to contributions (including contribution refunds);

(B)  Unitemized offsets to contributions (including contribution refunds);

(C)  Total offsets to contributions;

(vi)  Other disbursements;

(A)  Itemized other disbursements;

(B)  Unitemized other disbursements;

(C)  Total other disbursements;

(vii)  Total disbursements.

(3)  *Itemization of disbursements by political committees other than authorized committees*. Each political committee, other than an authorized committee, shall report the full name and address of each person in each of the following categories, as well as the information required by each category;

(i)  Each person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet the committee's operating expenses, together with the date, amount, and purpose of such operating expenditure;

11a

(A) As used in 11 CFR 104.3(b)(3), *purpose* means a brief statement or description of why the disbursement was made.

(B) Examples of statements or descriptions which meet the requirements of 11 CFR 104.3(b)(3) include the following: dinner expenses, media, salary, polling, travel, party fees, phone banks, travel expenses, travel expense reimbursement, and catering costs. However, statements or descriptions such as *advance, election day expenses, other expenses, expenses, expense reimbursement, miscellaneous, outside services, get-out-the-vote and voter registration* would not meet the requirements of 11 CFR 104.3(b)(3) for reporting the purpose of an expenditure.

(ii) Each affiliated committee to which a transfer is made by the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds by the reporting committee to another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfer;

(iii) Each person who receives a loan repayment from the reporting committee during the reporting period, together with the date and amount of such loan repayment;

(iv) Each person who receives a contribution refund or other offset to contributions from the reporting committee where such contribution refund was reported under 11 CFR 104.3(b)(1)(iv), together with the date and amount of such refund or offset;

(v) Each political committee which has received a contribution from the reporting committee during the reporting period, together with the date and amount of any such contribution, and, in the case of a contribution to an authorized committee, the candidate's name and office sought (including State and Congressional district, if applicable);

(vi) Each person who has received a loan from the reporting committee during the reporting period, together with the date and amount or value of such loan;

(vii) (A) Each person who receives any disbursement during the reporting period in an aggregate amount or value in excess of $200 within the calendar year in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure(s);

(B) For each independent expenditure reported, the committee must also provide a statement which indicates whether such independent expenditure is in support of, or in opposition to a particular candidate, as well as the name of the candidate and the office sought by such candidate (including State and Congressional district, when applicable), and a certification, under penalty of perjury, as to whether such independent expenditure is made in cooperation, consultation or concert with, or at the request or suggestion of, any candidate or authorized committee or agent of such committee; and

(C)  For an independent expenditure that is made in support of or opposition to a presidential primary candidate and is publicly distributed or otherwise publicly disseminated in six or more states but does not refer to any particular state, the political committee must report the independent expenditure as a single expenditure—i.e., without allocating it among states—and must indicate the state with the next upcoming presidential primary among those states where the independent expenditure is distributed, as specified in § 104.4(f)(2). The political committee must use memo text to indicate the states in which the communication is distributed.

(D)  The information required by paragraphs (b)(3)(vii)(A) through (C) of this section shall be reported on Schedule E as part of a report covering the reporting period in which the aggregate disbursements for any independent expenditure to any person exceed $200 per calendar year. Schedule E shall also include the total of all such expenditures of $200 or less made during the reporting period.

(viii) Each person who receives any expenditure from the reporting committee during the reporting period in connection with an expenditure under 11 CFR part 109, subpart D (52 U.S.C. 30116(d)), together with the date, amount, and purpose of any such expenditure as well as the name of, and office sought by (including State and Congressional district, when applicable), the candidate on whose behalf the expenditure is made; and

(ix)  Each person who has received any disbursement within the reporting period not otherwise disclosed in accordance with 11 CFR 104.3(b)(3) to whom the aggregate amount or value of disbursements made by the reporting committee exceeds $200 within the calendar year, together with the date, amount and purpose of any such disbursement.

(4)  *Itemization of disbursements by authorized committees*. Each authorized committee shall report the full name and address of each person in each of the following categories, as well as the information required by each category.

(i)  Each person to whom an expenditure in an aggregate amount or value in excess of $200 within the election cycle is made by the reporting authorized committee to meet the authorized committee's operating expenses, together with the date, amount and purpose of each expenditure.

(A)  As used in this paragraph, *purpose* means a brief statement or description of why the disbursement was made. Examples of statements or descriptions which meet the requirements of this paragraph include the following: dinner expenses, media, salary, polling, travel, party fees, phone banks, travel expenses, travel expense reimbursement, and catering costs. However, statements or descriptions such as *advance, election day expenses, other expenses, expenses, expense reimbursement,*

*miscellaneous, outside services, get-out-the-vote and voter registration* would not meet the requirements of this paragraph for reporting the purpose of an expenditure.

(B)  In addition to reporting the purpose described in paragraph (b)(4)(i)(A) of this section, whenever an authorized committee itemizes a disbursement that is partially or entirely a personal use for which reimbursement is required under 11 CFR 113.1(g)(1)(ii)(C) or (D), it shall provide a brief explanation of the activity for which reimbursement is required.

(ii)  Each authorized committee of the same candidate to which a transfer is made by the reporting committee during the reporting period, together with the date and amount of such transfer;

(iii)  Each person who receives a loan repayment, including a repayment of a loan of money derived from an advance on a candidate's brokerage account, credit card, home equity line of credit, or other lines of credit described in 11 CFR 100.83 and 100.143, from the reporting committee during the reporting period, together with the date and amount of such loan repayment;

(iv)  [Reserved]

(v)  Each person who receives a contribution refund or other offset to contributions from the reporting committee where such contribution refund was reported under 11 CFR 104.3(b)(2)(v), together with the date and amount of such refund or offset.

(vi)  Each person who has received any disbursement(s) not otherwise disclosed under paragraph (b)(4) of this section to whom the aggregate amount or value of such disbursements exceeds $200 within the election cycle, together with the date, amount, and purpose of any such disbursement.

*    *    *